Joseph Youse vs. Forman and wife and Trustees of Center College.

5bu337
106 651

CASE 12—PETITION EQUITY—JUNE 11.

# Joseph Youse vs. Forman and wife and Trustees of Center College.

APPEAL FROM BOYLE CIRCUIT COURT.

1. Youse died in 1865, without descendants. It was known that, for many years, he had kept a holographic will. Immediately after his burial, repeated but ineffectual searches were made for his will. Some months thereafter a paper in his hand-writing, with his signature cut or torn off, which was not there at the time of the previous searches, was found in his desk, where he kept his papers, by a party who was a legatee, and interested in its establishment as his will. The evidence did not establish whether this paper had been in friendly or unfriendly hands, nor whether it had been mutilated by decedent, or some other person; but it was proven that, a short time previous to his death, he had requested an attorney to come and stay all day with him, as he "wanted to change, or make a change, in his will;" and that those who were interested as against this paper being established as his will had no opportunity of getting possession of it, and mutilating and returning it to the place where it was found. *Held*—That if the paper, whilst absent from the desk where it was found, was in a friendly possession, all inferences of unfairness are met, and the cutting or tearing off the signature must be regarded as the act of decedent; that if he cut or tore off his signature, the law presumes it to have been done with intention to revoke; and that this presumption is fortified and strengthened by the extrinsic evidence, and that the will was revoked by the decedent.

2. The signature of the decedent remained appended to a codicil written on the margin of the paper from which decedent's signature had been cut or torn off. This codicil is held to have been revoked by the cutting or tearing off the signature from the body of the will.

3. The revocation of a will revokes all codicils appended to it, and especially all codicils which depend upon it for interpretation or execution.

VOL. V—22

4. A codicil, depending upon the body of the will for interpretation or execution, cannot be established as an independent will when the will itself has been revoked.

5. The party applying for the probate of a codicil, as an independent will, has the burden of proof, and must show that the deceased intended that it should operate as his will.

6. If the testator cut or tore off his signature to his will, the legal presumption that he did so with the intent to revoke, may be fortified or rebutted by extrinsic evidence.

7. Revoking a will with intent to make another, the failure to do so, does not revive the revoked will.

8. Where a testator does an act of cancellation or mutilation, with a view of having his will immediately changed or altered, where the act of cancellation and reconstruction are intended as part of the same transaction, and the reconstruction or republication of the will is not perfected, then the acts of cancellation are also to be diregarded as incomplete, because of the failure of the other essential acts.

A. HARDING,

GEO. R. McKEE, and

R. C. WARREN,　　　　　　　　　　　　　　For Appellant,

CITED.

- 1 *Jarman on Wills*, 3d *Amr. edn., s. pp.* 119, 127.
- 4 *Kent, s. p.* 532.
- 2 *Greenleaf on Ev.,* 2d *edn., top p.* 641, *note* 1.
- 1 *Redfield on Wills*, 307, 313.
- 5 *B. Mon.*, 58; *Steele, &c., vs. Price and wife.*

ROBERT J. & WM. C. P. BRECKINRIDGE,　　　For Appellant,

CITED—

*Revised Statutes, chap.* 106, *secs.* 10, 26, 28.

4 *Met.*, 168; *Sechrist, &c., vs. Edwards, &c.*

18 *B. Mon.*, 64; *Overton's heirs vs. Overton's ex'r.*

2 *Bush*, 558; *Smith, &c., vs. Kelly, &c.*

1 *Duvall*, 259; *Jacob, &c., vs. Miller.*

7 *Dana*, 90; *Allison vs. Allison.*

4 *Mon.*, 361; *Beauchamp's Will.*

Joseph Youse vs. Forman and wife and Trustees of Center College.

7 *B. Mon.*, 408; *Chrisholm's heirs vs. Ben., &c. (of color).*

1 *Williams on Ex'rs*, 140, 108–9–11, *note to p.* 129, *and p.* 126.

1 *Jarman on Wills, p.* 119, *and note* 4.

1 *Greenleaf on Ev., notes* 1 *and* 3 *to sec.* 681.

1 *Redfield on Wills, pp.* 306, 307, 331, 332.

3 *B. Mon.*, 392; *Beall's Will.*

3 *B. Mon.*, 242; *West's Will.*

4 *Dana*, 221; *Dobyn's Will.*


M. C. JOHNSON,

J. F. BELL,

DURHAM & JACOBS,

BELL & QUISENBERRY, and

VAN WINKLE & FOX,                              For Appellees,

CITED—

*Revised Statutes, sec.* 10, *chapter* 106.

8 *Dana*, 319–20; *Singleton, &c., vs. Singleton, &c.*

5 *B. Mon.*, 59; *Steele, &c., vs. Price and wife.*

18 *B. Mon.*, 65–6; *Overton, &c., vs. Overton, &c.*

4 *Met.*, 168–9; *Sechrist, &c., vs. Sechrist, &c.*

3 *B. Mon.*, 393; *Beall vs. Cunningham, &c.*

14 *B. Mon.*, 338; *Armstrong vs. Armstrong.*

1 *Williams on Executors*, 120.

1 *Jarman on Wills*, 161.

4 *Monroe*, 363–4; *Nevill Beauchamp's will.*

3 *Iredell*, 303; *Bennett vs. Sherrod.*


CHIEF JUSTICE WILLIAMS DELIVERED THE OPINION OF THE COURT:

M. G. Youse died July 26, 1865, domiciled in Boyle county. Search, immediately after his burial, was made for a will, and on several subsequent occasions, without effect. It was known that for many years he had kept

a holographic will, one dating as far back as the year 1833, another in the year 1847. At the time of the first search the appellant, Joseph Youse, a nephew of the decedent, Mr. Forman, the husband of decedent's recognized adopted daughter, she being a niece of Mr. Youse, a young gentleman related to Mr. Forman, and the two Misses Crutchfield and a Miss Green, relatives of Mrs. Youse, beside the attorneys, were present.

Joseph Youse remained but a few days after his uncle's death, and then left for his own residence at Louisville, since which he did not return until this litigation began.

Mrs. Forman, being confined to her bed, was not present at her uncle's death or burial, but visited the family some months subsequently, and remained there several weeks. Whilst so visiting, one morning, after opening the outer leaf of the family desk, and pulling out a drawer, by Mrs. Forman, a small green notebook, containing a sheet of foolscap paper, written all over and folded lengthwise, tied with a string passing transversely over the ends and around the book, was discovered on the top of the other papers, in full view, never before seen, though this drawer had been repeatedly searched; whereupon one of the Misses Crutchfield, standing close by, as she says, picked up the green book, saying at the same time, " *Here is something I have never before seen*." Mrs. Forman replying, " *That is the will*," at the same time taking it from her; she responding, " *No it ain't;*" Mrs. Forman replying, " *Yes it is, and I know where the string came from—it came out of the drawer of the press in the dining-room, and Jane Green put it there*."

By this paper Mrs. Forman and her children would be entitled to a legacy of five thousand dollars, whilst

she, not being an heir-at-law, could inherit nothing. The paper is dated December 23, 1847, and once had the decedent's signature affixed to it, but which, when found, was torn or cut off. There are several codicils, but one of which, however, affected the provisions in the body of the will, and this is dated March 20, 1858, which gives his entire residual estate, after the provisions for his wife and adopted daughter, to the "Treasuries of Foreign and Domestic Board of Missions, an equal half of the whole with each board, as a perpetual fund, to be invested in reliable stocks, and the interest only used—I mean the Old School Board of Missions."

The decedent had no issue; but Mrs. Forman had been born in his house, and being left an orphan in very tender years, he had reared and educated her; and though he had not legally adopted her, so as to make her an heir-at-law, he called her his daughter, and treated her with great parental affection.

He seems to have had a settled purpose for many years of leaving a will, and was deeply impressed with the importance of the charities of the Presbyterian Church, in which he had long been a member and communicant. There are many alterations, interlineations, and erasures in this paper, all done by his own hand. But one important alteration in the body of the paper, however, appears, and that is the increase of the legacy to Mrs. Forman and her children from two thousand dollars to five thousand dollars. But it is established, that, some ten or twelve days before his decease, when in fair health, and no indication of such sudden dissolution, that he requested an attorney and friend to come in a day or so and stay all day with him, as he "*wanted to change, or make a*

*change, in his will.*" It is also proved that he regarded with great affection a maiden niece of his wife, who had lived much about his house, was then considerably advanced in life, in very dependent circumstances, and without near and able relatives to depend on; that he often reflected on the conduct of her deceased uncle, who had, at his death, bequeathed a handsome sum to her sister, but nothing to her, saying, however, he would provide for her at his death; also, that Mr. and Mrs. Forman had lived with him from early in the year 1863 until January 1, 1865, and Mr. Forman had controlled his business, but not to his satisfaction, and that he had sometimes complained of Mr. Forman's conduct toward him; that Forman and wife went to live near Lexington immediately after removing from decedent's house; and the evidence shows neither visiting nor correspondence on the part of either after this separation, though not more than one day's travel apart.

Forman and wife, and those representing the church, propose to set up this paper as M. G. Youse's last will and testament under these circumstances.

That the decedent intended to make another will clearly appears. Whether he revoked this one with intent to so make another is not so clearly manifested, but must be determined upon inferences drawn from the facts developed, and the presumptions of law arising thereon.

It is apparent, beyond all doubt, that this paper had been returned to the drawer where it was found after the several searches had been made. Joseph Youse had not been there since his departure, soon after his uncle's decease; two of the young ladies who were staying with their disconsolate aunt were not heirs-at-law, and

they swear they had never, on any occasion, seen the paper before it was found, nor did they know their uncle had left a will. Miss Green, who was also there, had died soon after Mr. Youse's decease. Those ladies say Mrs. Forman, immediately after the finding of this paper, "*read it off without a balk.*"

Instead of being interested in destroying or canceling the will, Mr. and Mrs. Forman were deeply interested in setting it up; for she had never been legally adopted so as to make her an heir-at-law, and he was left as one of three executors; therefore, no rational presumption can exist that either Forman or wife destroyed the signature.

The evidence raises no fair presumption that Joseph Youse ever saw or knew of this paper. The evidence repels any presumption that these young ladies, nieces to Mrs. Youse, either knew of the will or ever had it in possession. Mr. Forman was an executor, and had a right to the legal custody of the will; he left Mrs. Youse's soon after the burial of her deceased husband, and was absent at Louisville several days.

If it be supposed he and his wife had the custody of this paper, such custody was consistent, both with good morals and with law; whereas, the custody of the niece of Mrs. Youse would be inconsistent with both, and raise the imputation of a criminal offense. The legal and logical inferences, however, from the custody of this paper, may be very important; for if it was in a friendly possession, all inferences of unfairness is met, and the tearing off the signature must be regarded as the act of the decedent, and the legal consequences of such an act by him must follow.

Section 10, chapter 106, 2 Stanton's Revised Statutes, 459, provides, that " no will or codicil, or any part thereof,

shall be revoked, unless under the preceding section, or by a subsequent will or codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed, *or by the testator*, or some other person, in his presence and by his direction, *cutting*, *tearing*, burning, obliterating, canceling, or destroying the same, *or the signature thereto, with intent to revoke*."

If the testator cut or tore off the signature to this paper, the law presumes it to have been done with intent to revoke. This legal presumption is fortified and strengthened by the extrinsic evidence. This paper had been wholly written by him, without, as it recites, the influence of any one, or, so far as appears, the knowledge of any one, before it was written ; that he intended to have another written by his attorney and friend; that he did not intend further to provide for Mrs. Forman, but did intend to do so as to his wife's maiden niece ; and as to the church, he probably intended to make no alteration ; but however clearly he intended, subsequently, to make another will, his failure to do so would not revive the revoked will, nor leave him testate instead of intestate.

In *Sumner vs. Sumner*, 7 *Harr. & J.*, 388, it was held, that a will deliberately canceled, without accident or mistake, is revoked, *though the testator afterwards intends to make a new one, but omits to do so.*

So in *Johnson vs. Brailsford*, 2 *N. & M.*, 272 ; *Dun vs. Brown*, 4 *Cow.*, 483 ; and *Jackson vs. Betts*, 6 *Cow.*, 377, it was held that the slightest tearing or burning, even of an unnecessary part of a will, accompanied by evidence *aliunde* of the intention to revoke, is a revocation. And in *Avery vs. Pixley*, 4 *Mass.*, 460, it was held, that though a seal be not requisite to a will, yet if one be affixed, and

Joseph Youse vs. Forman and wife and Trustees of Center College.

be afterwards torn off, this will amount to a revocation, if so intended.

In *Smock vs. Smock*, 3 *Stockt.*, *N, J.*, 156, it was held, where a party, in his lifetime, duly executed a will, which, after his death, was found in his private desk, wrapped in a newspaper, *but with the seal and all his signature, except the first initial, cut off, this was presumed to have been his own act, done animo revocandi.*

In volume 4, page 629, Comstock's edition of Kent's Commentaries, it is said : " The mere act of canceling a will does not amount to anything, unless it be done *animo revocandi.* The intention is an inference to be drawn from circumstances; and the fact of cancelling may be, in many cases, an equivocal act. If, however, the will be found canceled, *the law infers an intentional* revocation; *for it is prima facie evidence of it, and the inference stands good until it is rebutted.*

" The *inference is the same, and it would require strong proof to rebut it, if a will be traced to the party's possession, and be not forthcoming at his death.*"

In *Calvin vs. Fraser*, 2 *Hagg.*, 266, a will was executed in India in duplicate. One part remained there ; the other was brought to England by the testator, and it was not traced out of his possession, nor found at his death. It was held to be a *prima facie* presumption that the testator had destroyed the duplicate in his possession, intending thereby to revoke the other, and that this presumption must be negatived by the party setting up the will.

There is a class of cases—to which, however, this does not belong—where the testator does an act of cancellation or mutilation with a view of having his will immediately changed or altered; where the act of cancellation and the reconstruction of the will are in-

tended as a part of the same transaction, and the re-construction or republication of the will is not perfected, then the acts of cancellation are also to be disre-garded as incomplete, because of the failure of the other essential acts.

When all the facts in this case, with their logical and legal inferences, are considered, this case must stand at least as favorable to 'the heirs-at-law as though said paper had been found in its present mu-tilated condition among the decedent's papers on the first search.

The paper is abundantly established as being wholly written, with all the obliterations and interlineations, in decedent's handwriting. He was the only custo-dian of it ever known to any witness of either party in this case. It has not been traced to any unfriendly possession, inferentially or otherwise.

The original paper is before us, and the mutilation was obviously done with the intention of destruction, whether so done by the decedent or a spoliator. The presumption of law is that he did the act, and with the intent to revoke it. The extrinsic evidence cor-roborates this presumption of law rather than rebuts it. Our law secures the right of the testator to dis-pose of his property as seemeth good to him; but it disfavors the disinheriting lawful heirs in doubtful cases.

It is said there is a conflict between the evidence of Miss Crutchfield and Mr. Durham; but we think not. The latter was only detailing his recollection of a conversation by her, saying it was substantially ac-cording to her evidence, save in one particular, which he details. Her recollection would probably be the more accurate, as she was an actor in the scene and

conversation she was detailing; besides, with Mr. Durham's version, as his recollection is, the conversation would be unintelligible; but with her's it is quite intelligent.

It is said in *Redfield on the Law of Wills, chapter* 7, *section* 25, *paragraph* 16, *page* 311: " We have before adverted to a recent case (*Greenwood vs. Cozen*, 5 *Jur. N. S.*, 497, 1859), where it was decided that the codicils are dependent upon the will, and that the destruction of the latter was an implied revocation of the former ; and that it is for the party applying for the probate of a codicil alone, *to show that the deceased intended that it should operate separately from the will.* This is sometimes susceptible of being determined with reasonable certainty from the frame of the codicil. If it be entire and intelligible in itself alone, and especially where it contains an effective distribution of all or most of testator's estate, and was found carefully preserved by the testator, in a place where he must or naturally would have been aware of its existence, it will afford very strong presumption of an intention to have it operate ; but where these circumstances are wanting, or others, indicating a contrary purpose, exist, it may require different consideration, as where the dispositions of the codicil are so complicated with, and dependent upon, those of the will, as to be incapable of a separate and independent existence."

This codicil is found on the margin of one of the leaves whereon is written a part of the body of the will, and is dated March 20, 1858, more than seven years before testator's death.

" In conclusion, I respectfully enjoin on my *friend* and *executor, after carrying out my wish and desire expressed in these pages,* that my will is, that all my goods and effects,

of every nature and description, *after the decease of my dear wife, that can be realized,* shall go into the treasury of Foreign and Domestic Board Missions—one equal half of the whole into each board, as a perpetual fund, to be invested in reliable stocks, and the interest only used—I mean the Old School Board of Missions." To which his name remained without obliteration. But as his name was cut from the body of the will, at the bottom of the leaf, upon the margin of which this codicil was written, there is as little doubt of the intention to revoke it as of the main body of the will.

Without the main body of the will there is neither designated "*friend*" nor "*executor*" to execute it, and the provisions contained in the pages of the will are first to be carried out before the provisions of the codicil; when, therefore, they were destroyed, the codicil went with them; besides, it is perfectly impossible to execute this codicil without a resort to the provisions of the main body of the will. It cannot be set up as an independent will of itself; therefore, if it could be at all set up, the burden of proving that the testator intended it to operate as his will is on the propounders. Instead of such appearing, the extrinsic evidence repels this, and indicates that he intended to make a new will—the more strongly indicated by the fact, that whilst this will and the codicil were written by himself, he intended to have a new will written by his friend and attorney.

The codicils to the main paper, all being in the margins thereof, must share the fate of the body of the will; for these all depend upon, and are intimately interwoven with it, neither being sufficiently independent to be upheld and executed as a testamentary paper. Nor does the evidence indicate any intention of the testator to

have either of them sustained independent of the main body of the will.

Wherefore, the judgment is reversed, with directions to the circuit court to reverse the judgment of the county court, and remand the case to it, with directions to reject said paper, with all the codicils attached thereto, as not the last will and testament of M. G. Youse, deceased.